IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KOLETTE SMITH,

    *Plaintiff,*

vs.

BRIAN WILLIAMS and LABETTE
COUNTY MEDICAL CENTER d/b/a
LABETTE HEALTH,

    *Defendants.*

Case No. 20-CV-2224-EFM

**MEMORANDUM AND ORDER**

Plaintiff Dr. Kolette Smith brings suit against Defendants Brian Williams and Labette County Medical Center d/b/a Labette Health. The four remaining claims against Defendants include a claim under 42 U.S.C. § 1983 for denial of a property interest without due process of law, tortious interference with prospective economic advantage, false light invasion of privacy, and defamation. Before the Court is Plaintiff's Motion for Partial Summary Judgment (Doc. 106) and Defendants' Motion for Summary Judgment (Doc. 109). For the reasons stated in more detail below, the Court denies Plaintiff's motion as moot and grants Defendants' motion.

# I. Factual and Procedural Background[1]

Plaintiff Kolette Smith is a physician licensed in Kansas. Defendant Labette Health is a county hospital, which is a governmental entity in Kansas. Defendant Brian Williams has served as President and Chief Executive Officer of Labette Health since September 1, 2015. From 1999 to January 2018, Plaintiff performed services and had physician privileges at Labette Health.

## A. Contractual Agreements

There are four written contractual agreements that pertain to Plaintiff's working relationship with Labette Health. The first agreement is the "Physician Independent Contractor Agreement," dated February 13, 2011. This agreement contains a non-compete provision stating:

> The parties acknowledge that Physician is receiving substantial benefit from the Agreement. Furthermore, it is recognized that Physician may terminate this Agreement without cause, as provided in Article 5. Upon termination of this Agreement, Physician shall not be subject to any non-competition agreement so long as Physician does not provide physician services provided by Physician herein in affiliation with another hospital, health maintenance organization, preferred provider organization, independent practice association, or integrated health care delivery system not affiliated with Medical Center (collectively "Other Health Care Entities") within a sixty (60)-mile driving distance of Medical Center. Otherwise, Physician shall not provide, within a sixty (60)-mile driving distance of Medical Center, health care services in affiliation with such Other Health Care Entities or similar health care entities during the term of this Agreement or for a period of two (2) years following the termination of this Agreement without the prior written consent of the Board of Directors of Medical Center.

The agreement set forth a term/duration of the agreement and defined it as:

> The initial term of this Agreement shall begin on the 13th day of February 2011, (the "Start Date"), and extend for a period of three (3) years thereafter ("Initial Term"), subject to earlier termination as hereafter provided. The one (1)-year period following the Start Date shall be Contract Year 1 and the one (1)-year period following each anniversary of the Start Date shall be subsequent Contract Years.

---

[1] The facts are those uncontroverted by the parties.

Finally, the agreement also contains a provision stating that the agreement "is contingent upon approval of the Board of Trustees of Medical Center which shall be evidenced by the certification of the Secretary of said Board below." This agreement was not signed by Plaintiff, anyone on behalf of Labette Health, or the Secretary of the Board.

The second agreement, dated February 13, 2011, is the "Amendment to PRN Emergency Department Physician Independent Contractor Agreement." This agreement does not contain a separate non-compete provision, a duration provision, or terms requiring board approval. It was not signed by Plaintiff or anyone on behalf of Labette Health.

The third agreement is the "Emergency Department Physician Independent Contractor Agreement," dated June 6, 2012. Like the February 13, 2011, Physician Independent Contractor Agreement, this agreement contained the same non-compete provision and the same provision stating that the agreement was contingent upon board approval, as evidenced by the certification of the Secretary of the Board. The provision regarding the term/duration was similar, except the initial term began on June 6, 2012, and it extended three years past that date. Plaintiff and Jodi Schmidt, as President and CEO of Labette Health (at that time), signed this agreement. There was no signature from the Secretary of the Board.

The fourth agreement is the "Physician Independent Contractor Agreement." This agreement is dated August 1, 2021, but the parties agree that a typographical error exists, and the date should read August 1, 2012. This agreement also contains the same non-compete provision. In addition, the agreement contains provisions that state the initial term of the agreement begins on February 13, 2011, the agreement requires board approval, and the agreement is the entire

agreement between the parties.² This agreement was not signed by Plaintiff or anyone on behalf of Labette Health.

**B.    2017 through the Present**

On Thursday, June 22, 2017, Labette Health employee Tom Macaronas emailed Williams under the subject heading of "FW: Smith Emergency Dept Physician Ind Contractor Agr" and stated:

"Brian

I stumbled across this.

Yes I know it is unsigned. . .

t"

Williams responded to this email stating "I am thinking that most likely a contract was signed but we do not have a copy. Sandy can you look for this agreement signed? Thanks Brian"

Williams asked Sandy Beisel to find signed copies of Smith's agreements. On June 27, 2017, Beisel emailed Williams, identifying three documents:

> 2011.2.13 Kolette Smith MD – Physician Independent Contractor Agreement
> (Unsigned and not board approved)
>
> 2011.02.13 Kolette Smith MD – Amendment to PRN Emergency Depart. Physician Independent Contractor Agreement
> (Unsigned – did not need board approval)
>
> 2012.06.06 Kolette Smith MD – Emergency Department Physician Independent Contractor Agreement
> (Signed – but no board approval)

---

² The parties agree that the August 1, 2012 agreement contains these provisions, but the document submitted to the Court by the parties does not include all pages of this agreement. Only three pages of the agreement were included, and these pages do not have the provisions referenced above.

Williams testified that he believed that all the agreements were in force, even the ones that were not signed. In addition, Williams believed that the Emergency Department Physician Independent Contractor Agreement was "evergreen," or would automatically renew for consecutive years until terminated.

While Smith was providing services to Labette Health from 2012 to 2018, she was an employee of Quality Care, LLC, an entity co-owned by Smith. From February 13, 2011 to September 25, 2011, Labette Health paid Smith $500 per calendar day to provide hospitalist coverage services to Labette Health. From September 26, 2011 to January 31, 2018, Smith was paid $1000 per calendar day to provide hospitalist coverage services to Labette Health. This pay is consistent with the rate of pay set forth in the June 6, 2012 Emergency Department Physician Independent Contractor Agreement.

In the fall of 2017, Smith and Labette Health initiated discussions to enter into a new independent contractor agreement. On September 18, 2017, Smith prepared a Letter of Intent to negotiate and execute a new independent contractor agreement with Labette Health for her medical services. This letter indicated that she wanted to enter into a new agreement with "[n]o change in current hospitalist intensivist independent contractor relationship contract" and "[n]o change in current hospitalist intensivist duties, including days of the week Dr. Smith is providing coverage, current on call compensation . . . ." Labette Health offered multiple agreements, and the parties negotiated terms. Each of the draft agreements contained a non-compete provision. During negotiations, Smith's attorney represented to Defendants' attorney that Smith would agree to a non-compete provision, albeit with revised language. Ultimately, Smith refused to sign a new agreement.

On October 30, 2017, Williams sent a letter to Smith giving her notice of Labette Health's intent to terminate her agreements on January 31, 2018. This letter informed her that she was a party to three agreements, identifying the February 13, 2011 Physician Independent Contractor Agreement, the June 6, 2012 Emergency Department Physician Independent Contractor Agreement, and the August 1, 2021 (sic)[3] Physician Independent Contractor Agreement.[4] This October 30 letter also stated that each agreement allowed either party to terminate the agreements with 90 days' written notice. The letter also reminded Smith that she was subject to the non-compete provisions in the agreements and that Labette Health's intention was to enforce those non-compete provisions.

In an email dated January 31, 2018, Williams told Smith that her "medical staff privileges" were "separate and distinct" from their contractual relationship, including obligations to perform call services. He also stated that Smith was scheduled to be on call through 7:00 a.m. the morning of February 1 and then again February 5th through 11th.[5]

Following Smith's separation of employment on January 31, 2018,[6] Williams sent Smith a letter on February 1, 2018, informing her that because she refused to perform call services, her

---

[3] The parties agree that the date should be August 1, 2012.

[4] The Court notes that these three documents are not the same three documents identified in Beisel's email. The three documents in Beisel's email included two contracts from February 13, 2011 (Physician Independent Contractor Agreement and Amendment) and one contract from June 6, 2012 (Emergency Department Physician Independent Contract Agreement).

[5] From the Court's review of these emails, it appears as though the parties were engaged in phone discussions earlier in the evening, but those facts were not set forth in either party's facts.

[6] The facts surrounding Smith's departure are controverted. The parties disagree as to whether Smith refused to respond while she was on call between midnight and 7 a.m. Defendant asserts that Smith refused to respond, and Smith asserts that she never refused call obligations.

medical staff membership and clinical privileges were deemed voluntarily resigned. The letter also stated, in part:

> Further, as a consequence of your resignation of clinical privileges, Labette Health terminates its Agreement with you immediately, pursuant to Section 5.2(a). You are hereby reminded that you and Quality Care, LLC will remain subject to the non-competition provisions set forth in Section 8.6 of each of the Agreement, which stipulates, in part, that you may not provide health services for, or in conjunction with, any health care entities other than Labette Health within a 60 mile radius of Labette Health for a period of two years after termination of the respective Agreements. It is the intention of Labette Health to enforce the non-compete provisions in each of the above Agreements.

On January 29, 2018, Smith signed an agreement with Docs Who Care, a company that contracts with hospitals to provide temporary physician services to fill a short-term need. On February 2, 2018, the COO of Docs Who Care signed the agreement, and the agreement was effective as of February 1, 2018. Following February 1, 2018, Smith worked through Docs Who Care and was considered an independent contractor.

On February 23, 2018, Smith informed Kansas Heart Hospital that her "contract with Labette Health, Parsons, KS, expired on January 31, 2018, and I chose not to renew."

After February 1, 2018, Smith worked at Wilson Medical Center, Mercy Fort Scott, Sidney Regional Medical Center, Box Butte General Hospital, Norton County Hospital, Abilene Memorial Hospital, Great Bend Regional Hospital, Cheyenne County Hospital, Hanover Hospital, Kickapoo Tribal Medical Center, McPherson Center for Health, Coffeyville Regional County Hospital, and Newton Medical Center. From February 2018 through March 2019, Smith worked 2,649 hours at nine different hospitals through Docs Who Care. She provided services to many hospitals outside of the 60-mile geographic area of Labette Health. Smith received clinical privileges at every hospital she sought privileges from after leaving Labette Health.

A couple hospitals, including Wilson Medical Center and Neosho Regional Medical Center, are located within the 60-mile geographic area. In February 2019, Smith worked at Wilson Medical Center through Docs Who Care. On February 20, 2019, Williams emailed Docs Who Care asserting that Smith had a non-compete provision and was aware that she worked the past weekend at Wilson Medical Center "in violation of her Non-Compete, which we intend to enforce." On February 25, 2019, Williams emailed the COO of Docs who Care, stating:

> There are a number of signed agreements in her contract file, but a renewal from 2012 went unsigned but we continued to pay in good faith and perform, so we expect her to perform as well. If necessary, we will pursue all legal remedies available to us to insure such performance.

Williams also forwarded this email to Dennis Shelby, the CEO of Wilson Medical Center. He stated in this email "FYI while the amendment is unsigned, there was a meeting of the minds and an agreement made between the CEO and Physician, and we paid a substantial amount of money to her, so by the definition of law there was a contract." On February 27, 2019, the COO of Docs Who Care emailed Williams stating that "[w]e will honor your request regarding Dr. Smith."

In March 2019, a Docs Who Care representative contacted Smith to inform her that Wilson Medical Center had an upcoming four-day shift which was available for her to fill. The representative informed Smith that Docs Who Care had spoken to Williams who said he was "okay" with her taking those shifts. When the shift was re-offered to Smith, she declined.

In August 2019, Smith, on behalf of Quality Care, LLC, entered into an Independent Contractor Agreement with Sidney Regional Medical Center in Nebraska in which she agreed to provide services for two years from September 30, 2019 through September 29, 2021. This position required Smith to drive approximately 660 miles and work a schedule that was two weeks on and two weeks off.

Around September 2021, Smith sought and received privileges at Newton Medical Center. In September or October of 2021, Smith sought privileges at McPherson Hospital. In response to a request for verification regarding Smith, Labette Health responded on October 5, 2021. In this correspondence, Labette Health stated "Dr. Smith voluntarily resigned her privileges[,] failed to meet the call obligations mandated by pursuant to Labette Health Medical Staff Bylaws and Rules & Regs." Smith obtained privileges at McPherson Hospital in October of 2021 and provided services there until she started working for Coffeeville Regional Medical Center in February 2022. Smith continues to be employed by Coffeeville Regional Medical Center as a hospitalist. Smith holds unrestricted medical licenses in Kansas, Missouri, Iowa, and Nebraska.

### C. Procedural History

This case has a lengthy and complicated procedural history, and the Court will not set it forth in detail again in this Order. In short, the Court has considered two motions to dismiss, a motion for reconsideration, and a motion to strike.[7] The remaining claims include: (1) a § 1983 claim for denial of a property interest without due process; (2) a tortious interference claim, limited to acts occurring on or after February 16, 2019; (3) a false light invasion of privacy claim, limited to acts occurring on or after February 16, 2019; and (4) a defamation claim, limited to defamatory statements made on or after March 15, 2021.

Both parties have now filed motions for summary judgment. Plaintiff seeks partial summary judgment and the Court's ruling that no valid and enforceable contract existed between the parties, including the provision of a non-compete agreement. Defendants seek summary judgment in their favor on all claims.

---

[7] The Court issued Orders addressing these motions in Docs. 39, 55, and 82.

## II.   Legal Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[9] The movant bears the initial burden of proof and must show the lack of evidence on the nonmovant's claim.[10] If the movant carries its initial burden, the nonmovant may not simply rest on its pleadings but must instead set forth specific facts showing a genuine issue for trial as to those matters for which it carries the burden of proof.[11] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits; conclusory allegations alone cannot survive a motion for summary judgment.[12] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[13]

## III.   Analysis

Both parties filed motions for summary judgment. Plaintiff seeks partial summary judgment on whether a valid contract existed between the parties. Plaintiff asserts that a valid contract did not exist and thus there was no non-compete provision. Accordingly, Plaintiff

---

[8] Fed. R. Civ. P. 56(a).

[9] *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citations omitted).

[10] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citations omitted).

[11] *Id.* (citing *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

[12] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[13] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

contends that Defendants' assertion that Plaintiff was subject to, and violated a non-compete provision, was false.

Defendants seek summary judgment on all of Plaintiff's claims. In addressing Defendants' motion, the Court need not determine whether a valid contract existed between the parties or whether Defendants' statements were false regarding the non-compete provision because all of Plaintiff's claims fail for other reasons. Accordingly, the Court will only address Defendants' motion.

There are four remaining claims in this case, and the Court will address each in turn.

### A. Denial of a Property Interest Without Due Process under 42 U.S.C. § 1983

Defendants argue that Plaintiff cannot prevail on her § 1983 claim because she was never deprived of a property interest—her Kansas medical license. "Procedural due process is only available to plaintiffs that establish the existence of a recognized property or liberty interest."[14] "A license to practice medicine is a property right deserving constitutional protection, including due process."[15] In some circumstances, the actual revocation of a license is unnecessary but rather the "effective revocation" of that license has been found to be the deprivation of a liberty interest.[16] "Actions taken by the State which destroy the value or utility of a protected property interest

---

[14] *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (citation omitted).

[15] *Keney v. Derbyshire*, 718 F.2d 352, 354 (10th Cir. 1983) (citing *Green v. McElroy*, 360 U.S. 474, 492 (1959)).

[16] *See Stidham*, 265 F.3d at 1152-53 (finding that the plaintiff stated a claim for deprivation of a protected property interest by noting that the dissemination of false and fatally damaging allegations against the plaintiff to his potential employers, and in contravention of statutory procedures, resulted in the effective revocation of plaintiff's license because he was unable to use his license to obtain employment).

constitute a Fourteenth Amendment deprivation of that interest for which due process cannot be denied."[17]

The Court previously found that Plaintiff adequately alleged a procedural due process claim because she alleged that Defendants' actions resulted in the effective revocation of her property interest in her medical license. At this stage, however, the evidence shows otherwise. The uncontroverted facts show that between February 2018 and March 2019, Plaintiff worked 2,649 hours at nine different hospitals through Docs Who Care. The evidence also shows that following February 1, 2018, Plaintiff worked at 13 different hospitals. She holds unrestricted medical licenses in Kansas, Missouri, Iowa, and Nebraska.[18] To the extent that Plaintiff complains that she was unable to work one shift in 2019 due to Defendants' statements, this evidence falls far short as an effective revocation of her medical license. Instead, the evidence demonstrates that Plaintiff was able to fully utilize her medical license after leaving Labette Health, and she received clinical privileges at every hospital from which she sought privileges after leaving Labette Health. Thus, there is no evidence showing that Defendants' actions destroyed the value or utility of Plaintiff's medical license, effectively or otherwise. Accordingly, Plaintiff's procedural due process claim fails, and Defendants are entitled to summary judgment on this claim.

---

[17] *Id.* at 1153.

[18] The Court previously dismissed Plaintiff's liberty interest claim, but Plaintiff continues to reference cases regarding the deprivation of a liberty interest in reputational integrity. Plaintiff cannot again attempt to resurrect this failed claim.

### B. Tortious Interference with Prospective Business Advantage

Defendants argue that Plaintiff cannot establish as a matter of law a tortious interference with business advantage claim. Under Kansas law, the elements of a tortious interference with prospective business advantage claim are:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.[19]

The plaintiff also must prove malicious conduct by the defendant.[20]

As an initial note, Plaintiff's claim is limited to acts on or occurring after February 16, 2019. Defendants contend that Plaintiff cannot establish that she lost a legitimate business expectancy. In addition, they contend that Defendants were justified and protected by qualified privilege. Finally, they assert that Plaintiff cannot establish that they acted with malice.

The Court will only address Defendant's first argument as the uncontroverted facts demonstrate that Plaintiff did not lose any business expectancy. There are only three instances at issue. As to two instances, Newton Medical Center in 2021 and McPherson Hospital in 2021,[21] Plaintiff sought and received privileges at both these medical facilities. Thus, she did not lose any business expectancy.

---

[19] *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1115 (1986).

[20] *Id*.

[21] The Court notes that Plaintiff does not provide any admissible evidence regarding any purported statements to or interference with Newton Medical Center.

As to the third instance, Wilson Medical Center in 2019, Plaintiff claims that she lost a four-day shift at that hospital due to Williams telling someone that she had a non-compete provision that prohibited her from working within 60 miles of Labette Health. The facts, however, show that although Williams informed the COO of Docs Who Care and the CEO of Wilson Medical Center of his belief in Plaintiff's non-compete provision, the shift was re-offered to Plaintiff. A Docs Who Care representative contacted Plaintiff and informed her of a four-day upcoming shift at Wilson Medical Center. This representative also said that they had spoken to Williams who was "okay" with her taking those shifts, but Plaintiff declined. Thus, the evidence demonstrates that Defendants' actions did not cause the loss of this "business expectancy," but rather Plaintiff turned it down. Accordingly, the Court concludes that Defendants are entitled to summary judgment on this claim.

### C. False Light Invasion of Privacy

Plaintiff next asserts that Defendants are liable for false light invasion of privacy because Defendants falsely informed other health care facilities that she had entered a non-compete agreement with Defendants and that she refused to honor scheduled call obligations. A false light invasion of privacy claim requires "(1) publication of some kind . . . to a third party; (2) the publication must falsely represent the person; and (3) that representation must be highly offensive to a reasonable person."[22] Publication with a false light invasion of privacy claim requires "communicating it to the public at large, or to so many persons that the matter must be regarded

---

[22] *Dominguez v. Davidson*, 266 Kan. 926, 974 P.2d 112, 121 (1999) (internal quotation marks and citations omitted).

as substantially certain to become one of public knowledge."[23] Injury in a false light invasion of privacy claim requires "mental distress from having been exposed to public view."[24]

Plaintiff's claim is limited to acts on or occurring after February 16, 2019. Defendants assert that Plaintiff's false light invasion of privacy claim fails because there was no publication, and they are qualifiedly privileged. As noted above, publication requires communication to the public at large.[25] "[I]t is not an invasion of the right of privacy . . . to communicate a [private fact] to a single person or even to a small group of persons."[26] Without widespread disclosure, a false light invasion of privacy claim fails when "the alleged offensive statements [have] not become common knowledge in the business community or in any other public arena."[27]

Here, Plaintiff comes forward with no evidence that any false representations were communicated to the public at large or that any offensive statements became common knowledge in the public arena. Instead, the statements were only communicated to a few people. Plaintiff states that in Southeast Kansas, the business community among doctors and hospitals is small. Nevertheless, she simply engages in speculation that any false statements were published or communicated to this business community. She provides no evidence that any offensive statements became common knowledge. Accordingly, because Plaintiff does not present the Court

---

[23] *Id.* (quotation omitted); *see also Ali v. Douglas Cable Commc'ns*, 929 F. Supp. 1362, 1383-84 (D. Kan. 1996)

[24] *Dominguez*, 974 P.2d at 121 (quotation omitted).

[25] *Id.*

[26] *Werner v. Kliewer*, 238 Kan. 289, 710 P.2d 1250, 1256 (1985) (quotation omitted).

[27] *Dominguez*, 974 P.2d at 121.

with any evidence that false statements were made to the public at large, her claim fails. Defendants are entitled to summary judgment on this claim.

### D. Defamation

Plaintiff's final claim is one for defamation. Because Plaintiff's claim is limited to defamatory statements made on or after March 15, 2021, the only applicable statement is one made by Defendants on September 29, 2021, to McPherson Hospital. In this instance, Defendants responded to a request for verification of Plaintiff's employment by stating, "Dr. Smith voluntarily resigned her privileges[,] failed to meet the call obligations mandated by pursuant to Labette Health Medical Staff Bylaws and Rules & Regs."

A defamation claim involves "(1) false and defamatory words; (2) communication to a third person; and (3) harm to the reputation of the person defamed."[28] The Court will only address the third element of Plaintiff's defamation claim—whether her reputation was harmed by this statement. "Damage to one's reputation is the essence and gravamen of an action for defamation."[29] "[A] plaintiff may not rest on presumed damages but must allege and prove actual damages in a defamation action."[30] "Proof of such damages typically entails showing that persons deterred from associating with the plaintiff, that the plaintiff's reputation had been lowered in the community, or that the plaintiff's profession suffered."[31]

---

[28] *Byers v. Snyder*, 44 Kan. App. 2d 380, 237 P.3d 1258, 1270 (2010) (citation omitted).

[29] *Ali*, 929 F. Supp. at 1384 (quoting *Gobin v. Globe Publ'g Co.*, 232 Kan. 1, 649 P.2d 1239, 1243 (1982)).

[30] *Id.*

[31] *Id.* at 1385.

Here, Plaintiff presents no evidence indicating that there is a genuine question of material fact as to whether she suffered damages. It is undisputed that Plaintiff sought privileges at McPherson Hospital in 2021. And it is undisputed, despite Defendants' statement to McPherson Hospital, that Plaintiff obtained privileges. In addition, after Plaintiff received privileges at McPherson Hospital, she provided services and worked there until February 2022, when she began working for Coffeeville Regional Medical Center. Plaintiff does not present any other evidence that her reputation was damaged.

Plaintiff also asserts that she suffered emotional distress and thus contends that she has damages because of the emotional distress. However, "any claim for mental anguish is 'parasitic,' and compensable only after damage to reputation has been established."[32] Because Plaintiff cannot demonstrate reputational damage, she also cannot show damages for any mental anguish or emotional distress. Accordingly, Plaintiff's defamation claim fails, and Defendants are entitled to summary judgment.

In sum, Defendants are entitled to summary judgment on all of Plaintiff's claims.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 106) is **DENIED AS MOOT**.

---

[32] *Debord v. Mercy Health Sys. of Kan., Inc.*, 860 F. Supp. 2d 1263, 1280 (D. Kan. 2012) (quoting *Gobin*, 649 P.2d at 1244).

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 109) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 4th day of October, 2023.

This case is closed.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE